# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-3465

_____

Christopher D. Wright

*Plaintiff - Appellee*

v.

Byron Financial, LLC, a North Carolina limited liability company

*Defendant - Appellant*

William Byron

*Defendant*

_____

No. 16-3554

_____

Christopher D. Wright

*Plaintiff - Appellant*

v.

Byron Financial, LLC, a North Carolina limited liability company

*Defendant - Appellee*

William Byron

*Defendant*

Submitted: September 20, 2017
Filed: December 4, 2017
_____

Before LOKEN, ARNOLD, and SHEPHERD, Circuit Judges.
_____

ARNOLD, Circuit Judge.

Christopher Wright used to sell insurance policies for Byron Financial, LLC, a wealth-management firm. By contract, he was supposed to remit fifteen percent of his commissions to Byron Financial and repay it for certain expenses. When his job there ended, he began to sell insurance on his own. But for the next three months, he continued to use Byron Financial to review prospective clients and secure policy offers from insurance carriers, without paying for those services. Wright and Byron Financial then sued one another for breach of contract, with each party claiming that the other owed it money. They went to trial before a jury, and the jury found that only Wright had violated the agreement and that he owed Byron Financial $500,000.00. Wright moved the district court for judgment as a matter of law on Byron Financial's claim, a new trial, or a remittitur. The district court granted only a remittitur, reducing the jury's verdict to $245,510.93 without offering Byron Financial the alternative of a new trial. Both parties appeal that ruling, and we reverse and remand.

Wright maintains that the district court should have granted him judgment as a matter of law or a new trial instead of a remittitur. He argues in the alternative that the remittitur should have been for no more than $49,628.59. Byron Financial

-2-

contends that the verdict did not warrant a remittitur, the remittitur was for too little, and, in any event, the district court erred by granting one without giving Byron Financial the option of a new trial.

Wright contends that he was entitled to judgment as a matter of law because Byron Financial sought and recovered damages for services that fell beyond the scope of the breach-of-contract claim that it pleaded. He asserts that Byron Financial may not recover for its work on the cases he sent it after he had left his job (the "new cases") because Byron Financial sued him only for violating his employment contract, which, he argues, did not cover the new cases. But Wright did not raise this challenge in his pre-verdict motion for judgment as a matter of law. Although he mentioned it in his post-trial renewal of that motion, our review of the district court's denial of his motion "is limited to consideration of only those grounds advanced in the original, [pre-verdict] motion." *Nassar v. Jackson*, 779 F.3d 547, 551 (8th Cir. 2015).

In his pre-verdict motion under Federal Rule of Civil Procedure 50(a), Wright asserted that Byron Financial could not recover any damages for its work on his new cases because there was no evidence that he had agreed to pay for the work. Although the owner of Byron Financial testified that Wright had orally agreed to compensate it for the work under the terms of his employment contract, Wright contended that the agreement was invalid for various factual reasons. Those arguments did not preserve for our review the separate challenge that Byron Financial's claim predicated upon its work on Wright's new cases did not fall within the scope of its pleadings. *Cf. Miller v. Mills Constr., Inc.*, 352 F.3d 1166, 1171–72 (8th Cir. 2003). Since Wright did not raise that specific challenge in his Rule 50(a) motion, we have no basis to review it. *See Milhauser v. Minco Prods., Inc.*, 701 F.3d 268, 273 (8th Cir. 2012).

The trial record shows, moreover, that, instead of contesting Byron Financial's supposed amendment of its breach-of-contract claim, Wright consented to it, under Federal Rule of Civil Procedure 15(b)(2), when he did not object to Byron Financial's introduction of testimony that he had agreed to extend the terms of his employment contract to cover Byron Financial's work on his new cases. *See Am. Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 348 (8th Cir. 2013).  It is clear that Wright had actual notice of Byron Financial's intent to get paid for its work on his new cases because, before trial, he unsuccessfully tried to get the district court to prevent Byron Financial from seeking damages for that work.  It appears that the district court did not rule on that motion, choosing instead to wait to see the specific evidence that Wright wanted excluded. But Wright, as we observed above, did not object at trial that Byron Financial's evidence concerned matters beyond the scope of its pleadings.

Wright maintains that his failure to object did not mean that he was consenting to the trial of Byron Financial's amended claim for relief.  He argues that his consent cannot be inferred because the amendment of Byron Financial's pleadings was inconsistent with his stance that his contract could not be extended to new cases once it was terminated.  But Wright does not point to any authority that holds that implied consent cannot be found if the unpleaded issue is inconsistent with a position he once took.  The two cases he relies on stand only for the proposition that "a district court does not abuse its discretion by allowing [amendment by implied consent] if the amendment seeks to raise an issue not inconsistent with the position taken by the non-moving party earlier in the proceedings. " *Baker v. John Morrell & Co.*, 382 F.3d 816, 831 (8th Cir. 2004); *see also Am. Family Mut. Ins. Co.*, 705 F.3d at 348. We have not held the obverse of that rule to be true, as Wright assumes we have. Since he does not provide us with any reason to take that leap now, we do not do so.

We consider next Wright's assertion that the district court should have granted him a new trial, rather than a remittitur, because the jury's verdict was motivated by passion and prejudice.  *See Tedder v. Am.  Railcar Indus., Inc.*, 739 F.3d 1104, 1110

-4-

(8th Cir. 2014). We review a district court's denial of a motion for a new trial, as well as its decision to grant a remittitur instead, for an abuse of discretion. *Estate of Snyder v. Julian*, 789 F.3d 883, 888 (8th Cir. 2015); *Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1210 (8th Cir. 1999). Wright's only evidence of passion or prejudice—the jury deliberated for little more than one hour, and its verdict in favor of Byron Financial was for $500,000.00—raises only the weakest inference of jury misfeasance. Wright asserts that the jury's deliberation was insufficiently long to allow for thoughtful consideration, but "no rule requires a jury to deliberate for any set length of time." *United States v. Dolan*, 120 F.3d 856, 870 (8th Cir. 1997).

The size of the verdict, moreover, was not so monstrous, shocking, or plainly unjust as to require a new trial. *See Estate of Snyder*, 789 F.3d at 888. Although the verdict was almost double the amount that Byron Financial had requested in its summation, the excess might well have been the product of permissible forces: Byron Financial had asked the jury to award it its fifteen-percent share of Wright's more than $4 million of commissions, the district court had ruled that Byron Financial could not recover a $152,416.72 debt that the jury already knew about (thereby reducing the amount it could ask for in its summation), and the jury had heard evidence indicating that Wright discussed paying $500,000 to Byron Financial. Since the district court observed the trial unfold firsthand, we are "extraordinarily deferential" to its decision that only a remittitur was appropriate here. *See Dossett v. First State Bank*, 399 F.3d 940, 946 (8th Cir. 2005). We see no reason to second-guess that decision.

Finding the jury's verdict excessive, the district court ordered a remittitur in the amount of $245,510.93—$206,395.75 for commissions and $39,115.18 for expenses —a decision that satisfied neither party. We review a remittitur order for a manifest abuse of discretion. *Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1087 (8th Cir. 2017). A district court can remit a jury award only when it is so grossly excessive as to be monstrous, shocking, or plainly unjust. *Id*. The law of the

-5-

forum state governs when a verdict is excessive, and under Missouri law a verdict is excessive when it exceeds "fair and reasonable compensation." *Id.* at 1088; *see also* Mo. Rev. Stat. § 537.068. If a remittitur was justified, the issue becomes whether it comports with the "maximum recovery rule," under which damages may be remitted only to the maximum amount the jury could have reasonably awarded. *McCabe v. Parker*, 608 F.3d 1068, 1081 (8th Cir. 2010). In undertaking that review, "we assess the evidence in the light most favorable to the jury's award, drawing all reasonable inferences in support of [it]." *Climent-García v. Autoridad de Transporte Marítimo y las Islas Municipio*, 754 F.3d 17, 21 (1st Cir. 2014). When the discrepancy between the remittitur and the maximum amount reasonably supported by the evidence is apparent and the correction basically mechanical, the correction can be made at the appellate level. *See Universal Power Sys., Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 674–75 (8th Cir. 1987).

As a preliminary matter, we must determine whether the award may include damages for Byron Financial's unpaid work on the new cases. It is clear that both the jury and the district court found that Wright owed Byron Financial for that work since both the verdict and the remittitur include damages for it. Byron Financial maintained at trial that Wright owed it for the work since he had agreed to extend his employment contract to cover it. Wright asserts in response that his contract could not be extended because he and Byron Financial had already terminated it and also because any agreement they may have had to extend it was not in writing. But the district court heard those same arguments and held that Byron Financial could argue to the jury that the contract, though terminated, had been extended, leaving it to the jury to decide which cases the parties' agreement covered. Wright did not object to that ruling, nor does he challenge it now. Moreover, it is hardly foreign to Missouri law, which the parties agree applies to Byron Financial's claim, that a terminated contract can be resuscitated by mutual agreement and that parties may orally waive a provision requiring a writing. *See, e.g.*, *Crabby's, Inc. v. Hamilton*, 244 S.W.3d

-6-

209, 214–16 (Mo. Ct. App. 2008); *Smith v. Mohan*, 723 S.W.2d 94, 97 (Mo. Ct. App. 1987).

Wright next asserts that the trial evidence does not support the finding that his employment contract was in fact extended. But the jury heard testimony from Byron Financial's owner that Wright had orally agreed that the compensation provisions in his contract would govern Byron Financial's work on his new cases, and that Byron Financial had then provided services to him based on that agreement. That testimony provided sufficient evidentiary support for the finding: Although Wright gave his own version of events, the jury was free to reject his story that he thought Byron Financial was providing those services to him for free because, irrespective of any oral agreement they had reached, they did not sign a written one. *See Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 554 (8th Cir. 2017). We thus hold that the record supports the jury's and the district court's decision to award Byron Financial damages for its unpaid work on Wright's new cases.

The district court was nonetheless correct that the jury's verdict of $500,000.00 was excessive because the evidence did not support it. Byron Financial tries to justify the award by arguing that it was based on a voicemail from Wright that the jury heard. But in the voicemail, which Wright left for Byron Financial about one month after leaving his job, Wright merely stated that he would first need to realize $3.5-to-$4 million in "business paid" before "paying out" $500,000. That is too thin a reed to support Byron Financial's contention that Wright had promised to pay it $500,000.00 once he received that amount in commissions. *Cf. Greater Kan. City Laborers Pension Fund v. B.E.A.M., Inc.*, 754 F.2d 297, 298 (8th Cir. 1985). Byron Financial's contention also runs contrary to its fundamental position, which the record supports, that in return for its services on his cases, Wright agreed to remit fifteen percent of his commissions, as opposed to a lump sum. Throughout trial, moreover, Byron Financial treated the $500,000 figure in the voicemail as an estimation of its fifteen-percent share of the commissions. Where, as here, the evidence included detailed

accountings of the commissions Wright had received, the expenses he owed, and the money Byron Financial had already collected, it was not reasonable for the jury to rely upon the $500,000 estimate to the exclusion of everything else in reaching a verdict. Further, when the parties themselves focus on the dollar amounts set forth in those accountings, they come up with damages amounts far less than the one in the jury's verdict. The district court did not abuse its discretion in ordering a remittitur.

The issue now is whether the remittitur comports with the maximum recovery rule. *See McCabe*, 608 F.3d at 1081. Both parties argue it does not. Byron Financial contends that the evidence supports an award of $405,212.28, and Wright asserts that it supports one of $199,051.39. Delving into their calculations shows that their positions are much closer than they at first appear. The parties agree that we must credit Wright for the commissions and expenses Byron Financial has already received, and they both rely almost exclusively on exhibits admitted at trial, Plaintiff's Exhibit 56 and Defendant's Exhibit DDD, for their account of the commissions Wright generated. In addition, although Wright's employment contract provided that Byron Financial would receive less than fifteen percent of his commissions once they surpassed $3,333,334, the parties agree as well that Byron Financial is due fifteen percent of all his commissions, even though his total commissions ended up in the range of $4.8 million. Beyond that core of common ground, the devil is in the details.

Plaintiff's Exhibit 56 shows that Wright's cases generated $4,393,767 in base commissions, $514,142 of which has been forwarded to Byron Financial. Meanwhile, Defendant's Exhibit DDD shows that Wright's cases earned an extra $409,818.23 in base commissions, none of which has been remitted to Byron Financial. Thus, Wright has made $4,803,585.23 in commissions, fifteen percent of which—Byron Financial's share by contract—is $720,537.78. Deducting the amount that Byron Financial has already been paid, Wright still owes it $206,395.78 in base commissions.

We agree basically with the parties' calculations. Wright admits that Exhibits 56 and DDD establish that he owes Byron Financial $206,395.75 in base commissions. (The reason why his figure is three cents lower than our own is because, in writing out the commissions he generated, he eliminated the decimals and used $4,803,585.00 instead of $4,803,585.23.) Byron Financial maintains that it is owed $206,800.78 in base commissions, but it bases its figure on a couple of arithmetic errors. First, it asserts that Exhibit 56 shows $4,393,467 in base commissions, which shortchanges the actual amount by $300. Then, it asserts that Wright admitted at trial that he had received another $412,818.23 in commissions, when he did not: He merely agreed to accept Byron Financial's representation that Exhibit DDD showed that his cases had earned that much extra. But Byron Financial's math was off by $3,000. Once the parties' numbers are brought into line with the trial exhibits they are based on, their calculations begin to mirror our own.

The parties both use Plaintiff's Exhibit 62 to determine the amount of expenses Wright must still repay to Byron Financial, and the exhibit indicates that he owes $39,115.18. Wright accepts that figure, but asserts that $46,459.54 must be deducted from it to account for a check he sent to Byron Financial to satisfy the debts he owed it early in his tenure there. The exhibit, however, already credits Wright $31,596.00 from that check, and the jury could reasonably infer that the remainder of the check had already been credited, in Exhibits 56 and DDD, toward what Wright owes in base commissions. Byron Financial argues that Wright owes it $40,744.78 in expenses, but that figure ignores the $1,629.60 reimbursement that some insurance carriers had provided to Byron Financial to cover those expenses. Since the jury had no reason to ignore the reimbursement, we hold that the record, when viewed in the light most favorable to the jury's verdict, supports a conclusion that Wright still owes Byron Financial $39,115.18 in expenses.

Byron Financial asserts that Wright also owes it fifteen percent of the roughly $35,000 in renewal commissions that he earned, but Wright contends that he actually

-9-

made only $34,732.00 in renewals. Like most of the dollar amounts involved in this case, there are accountings in the trial record that set forth the specific amount at issue. Byron Financial, however, has chosen to rely on inexact statements about what those accountings show instead of the documents themselves. Since it does not contest Wright's representation of the actual amount of renewals involved, we will base our calculation on Wright's similar but more precise figure of $34,732.00.

The relevant section of their contract provides: "Except as provided below, all renewal commissions shall be split eighty-five percent (85%) to WRIGHT and fifteen percent (15%) to [Byron Financial]." The contract provides further that Wright "shall be entitled to all (i.e. 100%) of his renewal commissions after termination if and only if he assumes responsibility for servicing the contracts"; if Byron Financial "is asked or required to service the contracts," however, it "shall be entitled to all renewal commissions for as long as it services the[m]." The parties dispute the meaning of those provisions: Wright contends that he should receive one-hundred percent of the renewals because he continued to service those contracts, while Byron Financial argues that he is entitled only to one-hundred percent of his eighty-five percent share—without mentioning whether the issue was decided at trial by the court or the jury. *See D.R. Sherry Constr., Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 902 (Mo. 2010) (en banc). At trial, the district court allowed the parties to the contract to testify to their divergent interpretations of its provisions, indicating that the district court submitted the issue to the jury. *Cf. Weitz Co. v. MH Washington*, 631 F.3d 510, 524 (8th Cir. 2011). Neither party argues that the submission was improper, nor that the verdict indicated that the jury found Wright's interpretation correct. Since we must assess the evidence in the light most favorable to the jury's award, we find that Byron Financial is entitled to fifteen percent of the $34,732.00, i.e., $5,209.80 in renewal commissions. *See Climent-García*, 754 F.3d at 21.

At the beginning of Byron Financial's summation to the jury, Wright objected that Byron Financial was asking the jury to award it $152,416.72 for a payment that

an insurance carrier had issued it, but then reversed, because the carrier had also paid Wright the money.  The district court noted that Byron Financial had not yet returned the payment and that the carrier had not yet acted on that debt.  Finding it unsettled whether the carrier would ultimately seek repayment of the $152,416.72 from Byron Financial or Wright, the district court ruled that Byron Financial could not recover that amount from Wright.  Byron Financial now wants the $152,416.72 added to the remittitur, but in doing so it fails to acknowledge the district court's ruling barring it from such a recovery.  Byron Financial, moreover, has appealed from only the district court's orders granting and issuing the remittitur, not from the judgment entered upon the jury's verdict.  *See Rosillo v. Holten*, 817 F.3d 595, 597 (8th Cir. 2016).  Even if we had jurisdiction to review that trial ruling, Byron Financial does not address it, waiving its opportunity to challenge it.  *See White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir.  2017).  Since the ruling constitutes a categorical bar to the relief Byron Financial requests, we hold that the relief may not be awarded as part of a remittitur.

In sum, we hold that, under the maximum recovery rule, Wright owes Byron Financial $206,395.78 in base commissions, $5,209.80 in renewal commissions, and $39,115.18 in expenses, totaling $250,720.76.  The district court therefore erred when it ordered a remittitur in the amount of $245,510.93, "an amount less than the jury could reasonably find." *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1019 (8th Cir. 2007).  The district court was essentially correct in its calculation of the maximum amount of base commissions and expenses that the jury could reasonably award to Byron Financial: The difference between its remittitur and our own comes down to the renewal commissions that we have added to the award.  This highly technical error hardly detracts from the commendably conscientious attention that the district court gave this case, but we cannot say that the error was *de minimis*.  That being so, the record requires a reversal of the remittitur order.

The final assignment of error in this case concerns the district court's ordering a remittitur without first obtaining Byron Financial's consent. Under the Seventh Amendment, the district court had "no authority" to enter an absolute judgment for a remitted sum. *See Hetzel v. Prince William Cty.*, 523 U.S. 208, 211 (1998) (per curiam). So the district court erred by not allowing Byron Financial to choose between the judgment as remitted and a new trial. *See Thorne*, 197 F.3d at 1212.

We remand this action to the district court with directions to provide Byron Financial with the option of accepting a remittitur in the amount of $250,720.76. If Byron Financial consents to the remittitur within a reasonable amount of time to be fixed by the district court, the court shall enter the remittitur order. If Byron Financial does not accept the remittitur, the district court shall vacate its judgment as to damages and order a new trial on that issue.

_____